## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (this "Agreement") is entered into and effective as of October 20, 2016 (the "Effective Date") by and between Grove City Surgery Center, LLC ("Client"), and Sullivan Healthcare Consulting, LLC ("Consultant"), with its principal place of business located at 2655 Northwinds Parkway, Alpharetta, Georgia. Client and Consultant may hereafter be referred to, individually, as a "Party" and, collectively, as the "Parties."

### BACKGROUND

A. Client is building a for-profit ambulatory surgery center (the "Surgery Center") in Grove City, Ohio.

B. Consultant has represented to Client that it has the skills and experience to provide consulting services during construction, opening and first year of operation of ambulatory surgery centers.

C. Client desires that Consultant provide consulting assistance and support during construction, opening and first year of operation of the Surgery Center (the "Project"), and Consultant desires to provide such services to OhioHealth.

### AGREEMENT

In consideration of the foregoing Background, which is incorporated herein as if fully restated, and the mutual promises and undertakings of the Parties, and for other good and valuable consideration, receipt of which is hereby acknowledged, Provider and Customer agree as follows.

1. *Services*.
   1.1. *Engagement.* Client hereby engages Consultant, and Consultant hereby accepts such engagement, as an independent contractor, to provide certain services to Client on the terms and conditions set forth herein.

   1.2. *Services.* Consultant will provide certain consulting services to Client, including assignment of requisite personnel to the Project (the "Project Team"), all as set forth on Exhibit A attached hereto and incorporated herein by reference (the "Services"). Consultant and the Project Team will at all times comply with Client's policies governing access to Client's property. Such policies will be made available to Consultant upon request.

   1.3. *Qualification.* Consultant represents and warrants that it has the qualifications and experience needed to provide the Services and that all the Services will be provided in a workman-like manner and in accordance with industry standards. References for similar services provided by Consultant are set forth in the proposal submitted by Consultant with regard to this Project (the "Proposal").

EXHIBIT 1

1.4. *Time of the Essence.* Time is of the essence, and Consultant represents and warrants that the Services will result in the timely completion of the Project and agrees that Consultant's failure to meet this deadline shall constitute a material breach of this Agreement, except that Consultant shall not be responsible for any acts or omissions by Client or third parties outside of Consultant's reasonable control, to the extent such acts or omissions result in a delay of the Project.

2. *Payment of Fees.* All fees and expenses payable for the Services, including the payment schedule, are set forth in Exhibit B, attached hereto and incorporated herein by reference. Consultant shall charge Client only for the Services provided on site. Consulting fees will be invoiced monthly as set forth in the payment schedule in Exhibit B. Client shall reimburse Consultant for any reasonable and preapproved out-of-pocket expenses such as lodging and travel expenses, which will be submitted through separate invoices. All invoices will be sent via email.

3. *Client Responsibilities.*
    3.1. Client will provide a project coordinator who has authority to coordinate information collection and establish meeting schedules.

    3.2. Client will follow the proposed methodology and the work plan which Consultant will prepare immediately upon execution of this Agreement.

    3.3. Client personnel will be reasonably available for interviews as requested by the Project Team with at least a seven-day advance notice.

    3.4. Client will provide office space for use by the Project Team while on site as reasonably requested by Consultant.

4. *Notices.* All notices required under this Agreement shall be in writing and shall be delivered by regular U.S. mail, facsimile, personal service, certified mail return receipt requested, or by overnight mail. All notices shall be sent to the parties at the following addresses unless a change of address is provided in writing.

    If to Client:

    Grove City Surgery Center, LLC
    C/O Deb Kuntz MBA, BSN, RN
    Senior Director Joint Ventures
    OhioHealth Neighborhood Care
    180 E. Broad Street
    Columbus, Ohio 43215

    If to Consultant:

    Sullivan Healthcare Consulting, LLC
    Attn.: Randall Heiser, President

2655 Northwinds Parkway
Alpharetta, Georgia 30009

5. *Relationship of the Parties.* The relationship of the Parties is that of independent contractors. This Agreement does not create a partnership, association or other business entity. Except with respect to Consultant decisions regarding management of staff at the Surgery Center, neither party has the right to bind the other.

6. *Indemnification.* Consultant shall indemnify, defend and hold harmless Client, its managers, shareholders, directors, officers, employees, agents and affiliates (collectively, the "Indemnified Parties"), from and against claims by third parties (including costs and actual attorney fees) arising out of or based upon the Services, breach, or any act, error or omission relating to the performance of the Services under this Agreement, except insofar as any such claim arises out of or is based upon negligence or willful misconduct of any of the Indemnified Parties. Client shall give Consultant prompt notice of any such claim, allow Consultant to control the defense and/or settlement of such claim, and cooperate with Consultant in all matters related thereto, at Consultant's cost. The indemnity obligations hereunder shall survive the termination of this Agreement.

7. *Limitation of Liability.* Except for Consultant's indemnification obligations and Consultant's representations regarding timely completion of the Project, neither Party shall be liable to the other for punitive, special, consequential, incidental or indirect damages including without limitation, lost profits.

8. *No Third Party Beneficiaries.* Neither this Agreement nor the Services rendered hereunder are intended for the benefit of third parties. All Services are rendered only to Client, and Client is solely responsible for whether and how such Services (and the advice embodied therein) are used with respect to employees, patients, and other third parties.

9. *Confidentiality.*
    9.1. *Definition.* As used herein, the term "Confidential information" shall mean all intellectual property of either Party, and all information, documentation, software (including listings thereof and documentation related thereto) related to either Consultant's or Client's business and affairs and other information disclosed by or made available by either Party (the "Disclosing Party") to the other (the "Receiving Party"), including but not limited to either Party's business plans or present or future services or policies.

    9.2. *Obligations of the Parties Concerning Confidential information.* All Confidential Information of the Disclosing Party coming into the Receiving Party's possession will be treated by the Receiving Party as confidential and will not be disclosed to any third party for any purpose whatsoever except to allow the Receiving Party to carry out the purposes of the disclosure. In addition, the Receiving Party shall not incorporate any of the Confidential Information in any product or process (whether or not the Confidential Information is disclosed or not) without the prior written permission of the other party. The Receiving Party agrees to take all reasonable steps to safeguard the confidentiality

of all such Confidential Information, and agrees that the Confidential Information shall only be disclosed to those of its employees who have a need to know the same in order for the Receiving Party to carry out the purposes of the disclosure. The Receiving Party shall take all steps necessary to bind each of its employees to obligations of confidentiality and non-use in the event Confidential Information is to be disclosed to such employees, including, but not limited to, having the Project Team sign a confidentiality agreement with terms not less stringent than contained herein.

9.3. *Return of Confidential Information.* Upon completion of the provision of the Services, subject to applicable law, all tangible items containing Confidential Information held by Consultant shall be destroyed (as evidenced by a certificate of destruction delivered by Consultant to Client), returned or properly archived, as directed by Client. If Client does not request one of these options for the disposition of materials within 60 days after the expiration or termination of this Agreement, Consultant shall promptly return all such tangible material to Client. Consultant will continue to maintain any Confidential Information that was not capable of being destroyed in accordance with and subject to the provisions of this Agreement.

9.4. *Exclusions.* The obligations of the Receiving Party under this Agreement do not apply to any Confidential Information which:
   (a) Can be shown by the Receiving Party to have been in its possession prior to receipt thereof from the Disclosing Party; or
   (b) Is now, or hereafter becomes, generally available to the public through no act or failure to act by the Receiving Party or of any of its employees; or
   (c) Was independently developed by the Receiving Party or its employees for purposes unrelated to duties owed under this Agreement; or
   (d) Can be shown by the Receiving Party to have been received by them on a non-confidential basis from a third party who was not under obligation of confidentiality to the Disclosing Party.

9.5. *Injunctive Relief.* The Parties mutually acknowledge and agree that each Party's Confidential Information is proprietary to, or a valuable trade secret of, the Party and that any disclosure or unauthorized use of the Disclosing Party's Confidential Information by the Receiving Party will cause the Disclosing Party irreparable harm and loss. Accordingly, each Party agrees that the Disclosing Party shall have the right to seek and obtain immediate injunctive relief from breaches or threatened breaches of the confidentiality obligations under this Agreement.

9.6. *Compelled Disclosures.* Should the Receiving Party become compelled, in the opinion of its counsel, by law, regulation, or court order or other legal process to disclose any of the Confidential Information, it will promptly notify the Disclosing Party to permit the Disclosing Party to seek protective orders or other appropriate remedy. In the event that such protective order or other remedy is not obtained, or that the Disclosing Party waives compliance with the terms of this section, the Receiving Party agrees to and shall provide only the limited portion of the Confidential Information that it is advised by its counsel is legally required and to exercise reasonable efforts to obtain assurance that

confidential treatment will be accorded such Confidential Information.

9.7. *Survival*. The restrictions and obligations of this Section shall continue to bind the Parties and their respective agents, its successors heirs and assigns during the term of any business dealing between the Parties, and shall survive for an additional period of three (3) years beyond the termination of any agreement between them, whether executed prior to or subsequent to this Agreement, and in the event of a trade secret, for as long as the Disclosing Party maintains the trade secret as such.

9.8. *Data Confidentiality*. Consultant acknowledges and agrees that all material, data, reports, statistics, policies, procedures, minutes, and/or any information pertaining to clinical or operational benchmarking is considered confidential. Consultant warrants and certifies that such "Confidential Information" shall be and remain confidential. Consultant may write or publish studies where Client's data is aggregated, summarized, and otherwise handled in a way which does not allow Client's data to be extracted, identified, or derived showing Client as the data source. This warranty shall be a continuing duty of Consultant, which shall survive the termination of this Agreement.

9.9. *Third Party Information*. In order for Consultant to render the Services, it may be necessary for Client to disclose to Consultant information concerning or obtained from patients, vendors and other third parties. Client represents and warrants to Consultant that all such information heretofore and in the future disclosed to Consultant in pursuance of the Project has been and will be disclosed in a manner that does not violate the right of third parties.

9.10. *HIPAA*. The Parties acknowledge and agree that individually identifiable health care information is to be protected as required by the Health Insurance Portability and Accountability Act of 1996, and related regulations issued thereunder (collectively, "HIPAA"), and other laws to the extent applicable. The Parties agree to enter into the Business Associate Agreement attached hereto as Exhibit C, in order to comply with the requirements of any such applicable laws and regulations, including but not limited to HIPAA. The Parties agree that a breach of the Business Associate Agreement constitutes a material breach of this Agreement.

10. *Publications.* No information or research findings resulting from this Project or use of Consultant data or methodologies including presentations at symposia; national, or regional professional meetings, journal publications; theses or dissertations; or other writings will be made public without the express prior consent of Consultant.

11. *Right to Subcontract*. Consultant may not subcontract to third parties any of the deliverables hereunder, unless Consultant first receives the written consent of Client.

12. *Disclosure on Consultant's Website*. Unless Consultant first obtains Client's consent in writing to the contrary, Consultant may not list the identity of Client in the "Representative Client" section on Consultant's website or in Consultant's other promotional materials.

13. *Taxes.* Client shall be responsible for any sales, use, excise, value-added services, consumption or other tax, during the term of this Agreement, that is assessed on the provision of the Services as a whole or on any particular one of the Service received by Client.

14. *Term and Termination.*
    14.1.   *Term.* This Agreement shall remain in effect until all the Services have been completed by Consultant, unless earlier terminated by either of the Parties as provided herein.

    14.2.   *Termination.*
    (a) If Client believes that Consultant is not fulfilling its obligations under this Agreement in some material respect and it intends to terminate this Agreement, Client will provide Consultant with a written notice providing ten days to correct the situation. If the situation is not corrected within that time or a mutually agreed upon time period, Client may immediately terminate this Agreement.
    (b) Notwithstanding anything to the contrary contained herein, Client may terminate this Agreement immediately without providing notice if Consultant violates any of its confidentiality obligations or if Client, in its reasonable discretion, otherwise determines that the situation cannot be corrected within the notice period.
    (c) With respect to the Project, Client may terminate this Agreement upon 30 days' advance notice for any reason or no reason at all. A termination by Client shall not affect Client's obligation to pay for unpaid fees that were earned and expenses accrued by Consultant prior to the effective date of such termination and in accordance with the terms of this Agreement.

15. *Force Majeure.* Noncompliance with any obligation under this Agreement for reasons of force majeure (such as acts, regulations or laws of any government; war or civil commotion or destruction of production facilities or materials; fire, earthquake or storm; labor disturbances; failure of public utilities or common carriers, and any other causes beyond the reasonable control of the Party affected) shall not constitute a breach of this Agreement.

16. *Work for Hire.* All new or original work product, documents, computer programs, source code, software products or systems that are developed by Consultant in the course of providing the Services, and all patents, copyrights and other intellectual property rights that derive from the Services, shall be the exclusive property of Client (the "Work Product") and shall be considered "work for hire" under pertinent copyright and intellectual property laws. Consultant represents and warrants that the Services and the Work Product will not violate, infringe upon, or misappropriate any third party's intellectual property, proprietary, or contractual rights. Consultant hereby assigns all copyrights and intellectual property rights in the Work Product exclusively to Company. To the extent the Work Product contains any intellectual property of Consultant, Consultant hereby grants Company a non-exclusive, non-assignable, royalty-free, perpetual license to use such intellectual property.

17. *License.* All pre-existing intellectual property used by Consultant in the implementation of this Agreement shall remain the sole property of Consultant. Consultant hereby grants to Client a perpetual, worldwide, royalty free (except for the payments described elsewhere

herein), non-exclusive license to use, but not to sell, transfer or sublicense, such intellectual property insofar as necessary to enable Client to realize intended benefits of the Services provided by Consultant hereunder, provided that this license does not apply to any trademark, service mark, trade name or corporate name owned or used by Consultant or any of its affiliates. All written material provided to Client by Consultant is protected under copyright law.

18. *Insurance/Liability*. Consultant agrees to carry at all times during the effectiveness of this Agreement professional liability insurance coverage in amounts no less than $1,000,000 USD per occurrence and $3,000,000 USD in the aggregate.

19. *Agreement Not to Hire*. Consultant and Client agree that they will not, and will not permit any affiliated institution to employ, or offer to employ, any of the persons employed by Consultant or Client, likewise, until after the expiration of one year after termination of this Agreement.

20. *Interpretation of Agreement, Venue*. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Ohio, excluding its choice of law provisions. The Parties agree that the sole and exclusive venue for any claims arising out of this Agreement shall be a court of competent jurisdiction located in Franklin County, Ohio.

21. *Entire Agreement*. This Agreement, including all exhibits represents the entire agreement of the Parties and any amendments must be in writing and executed by both Parties. In the event of a conflict between this Agreement and any of the exhibits, the term of this Agreement shall prevail.

22. *No Excluded Persons*. Consultant warrants and represents that at the time of entering into this Agreement and throughout its term, neither it nor any of its employees, officers, directors, contractors, subcontractors or agents are ineligible persons identified on the General Services Administrations' List of Parties Excluded from Federal Programs (available through the internet at http://www.arnet.gov/epls) or the HHS/OIG List of Excluded Individuals/Entities (available through the internet at any successor internet sites). In the event Consultant or any of its employees, officers, directors, contractors, subcontractors or agents ("Personnel") becomes an ineligible person after entering into this Agreement or otherwise fails to disclose its ineligible person status, Consultant shall (1) immediately notify Client of such ineligible person status and (2) Client may immediately terminate this Agreement.

23. *Counterparts*. This Agreement may be executed in multiple counterparts.

24. *Severability*. If a court of competent jurisdiction holds that any provision of this Agreement is illegal, unenforceable, or invalid, in whole or in part, for any reason, the validity and enforceability of the remaining provisions, or portions of them, will not be affected.

25. *Conflict of Interest*. As of the Effective Date, Consultant represents that it is unaware of any circumstances that constitutes an actual or potential conflict of interest, such as an engagement by a competitor, or that would otherwise impair Consultant's ability to provide

objective assistance. During the term of this Agreement, Consultant may be requested to be engaged by parties which, although not competitors of Client, may involve interests which are not consistent with the interests of Client. Consultant agrees that it will not accept an engagement representing an actual or potential conflict of interest which involves the same or similar subject matter of this Agreement or the Proposal, without first obtaining a written waiver of such conflict by Client.

26. *Compliance with Laws*. It is the intent of the Parties to comply fully with all applicable federal, state and local laws, and each Party shall comply with all such laws in the conduct of their respective obligations under this Agreement.

This Agreement has been executed by Company and Consultant, each duly authorized to enter into this Agreement, to be effective as of the Effective Date.

Client: GROVE CITY SURGERY CENTER, LLC

Signature: *Joseph Calvaruso*

Name: Joseph Calvaruso

Title: Accountable Executive

Consultant: SULLIVAN HEALTHCARE CONSULTING, LLC

Signature: *Randall Heiser*

Name: Randall Heiser

Title: President

# EXHIBIT A
# THE SERVICES

*A.1 Pre-Opening of the Surgery Center:*
- Facility evaluation, planning, and design support, monitor progress of construction, participate in inspections, and obtain the certificate of occupancy
- Work with architects to ensure a well-designed facility that supports efficient operations
- Assist in preparation/development of policies and procedures, job descriptions, etc.
- Ensure accreditation/certifications, licensures, and all other approvals required are obtained for timely opening of the Surgery Center
- Assist in recruiting, training, and educating staff
- Assist in equipment and supply acquisition and set up
- Assist in scheduling system set up and implementation
- Assist in billing implementation
- Provide and assist in implementation of sustainable system and processes, such as education, infection control, etc.
- Review the Surgery Center's existing governance structure and make recommendations regarding necessary management positions and personnel to support efficient operations
- Assist in recruiting a permanent administrator and provide training and mentoring to ensure a smooth transition of the role
- Assign an Executive Sponsor and place a Project Director and Clinical Educator on site
- Place Content Matter Experts (CME) on site as needed to assist with:
    - Facility Design
    - Operations
    - Scheduling
    - Sterile Processing
    - Business Operations
    - Regulatory Standards

*A.2 Opening and First Year of Operation:*
- Ensure on-time opening during the third quarter of 2017 and smooth startup and ramp-up phase
- Smooth transition to a self-sufficient management model - all staff and administration working for the Surgery Center
- As requested, place an Interim Administrator on site, on a full-time basis if needed, and until the Facility Administrator is ready to manage facility
- Consultant will provide ongoing support by senior staff to ensure that milestones are met, governance models are in place, and quality assured.

*A.3 Project Team*

The Project Team consists of the following members:

- Executive Sponsor - Gerry Biala, Senior Vice President, 1-3 days per month for 18 months. Gerry will be responsible for the Project and overall client satisfaction. He will assist the project director with governance issues and meet with the board monthly.

Additional project team members will include:
- Facility Consultant - Randy Heiser, President, 1-2 days per month for 2-4 months to oversee the facility design phase of the Project.
- Project Director - Anne Roy, Vice President, 2 weeks per month for 12-18 months. Anne will be responsible for regulatory standards, accreditation, governance issues, and overall Project management.
- Interim Administrator - on-site assistance, full-time for up to 18 months, as requested by Client, to accomplish all organization, business, supply chain, and recruitment functions of the Project.
- Clinical Educator - on-site assistance, full-time for 4 months (2 months prior to opening and 2 months after opening) to educate and train new staff and to establish orientation and competency checking processes.
- Various CMEs - on site as needed to assist with operations, education, business operations, regulatory standards, etc.

Consulting profiles for Mr. Biala, Mr. Heiser, and Ms. Roy, as well as consultants that may be assigned to the Project Team, can be found in the Proposal.

*A.4 Project Start-Up*
- Upon execution of this Agreement, Consultant will immediately place an experienced interim administrator on site. Facility evaluation and design assistance will begin immediately. Additional consulting assistance will begin within the first month of the Project.
- The Project Director will prepare a detailed work plan with clear milestones within the first two weeks on site. This plan will be reviewed with the board initially and then monthly thereafter to ensure the Project is progressing on time.
- At all times during the Project, members of the Project Team will serve on an as-needed basis as determined by Client in cooperation with Consultant. Client may request that Consultant either remove or replace a Project Team member assigned by Consultant to the Project, upon providing a two- week notice in writing to Consultant, unless the Project Team member's conduct is so egregious in nature that immediate removal or replacement is required. Client will not be required to pay fees or expenses for any Consultant personnel after removal from the Project Team.

## EXHIBIT B
## PROJECT COSTS AND PAYMENT SCHEDULE

The consulting fees for the Project are noted below. Consultant will only be charged for actual time spent on site by the Project Team. All assignments set forth below are based on estimated times and may change as needed or requested by Client.

*B.1 Consulting Fees and Expenses*

| | |
|---|---|
| • Executive Sponsor - on site 1-3 days per month for 18 months | $3,000 per day plus out-of-pocket expenses* |
| • Facility Consultant - on site 1-2 days per month for 2-4 months | $3,000 per day plus out-of-pocket expenses* |
| • Project Director - on site 2 weeks per month for 12-18 months | $8,000 per week plus out-of-pocket expenses* |
| • Interim Administrator - on site, full-time for up to 18 months | $8,000 per week** plus out-of-pocket expenses* |
| • Clinical Educator - on site, full-time for 4 months (2 months prior to opening and 2 months after opening) | $7,500 per week** plus out-of-pocket expenses* |
| • Content Matter Experts - on-site assistance as needed in various areas | $2,500 per day plus out-of-pocket expenses* |

*Out-of-pocket expenses include Project Team member travel, lodging, transportation, on-site per diem maintenance, telephone charges, copying, postage/shipping, etc. The out-of-pocket expenses will be dependent upon amount and timeliness of in-house assistance and variable travel expenses over the course of the Project.

**Weekly is typically defined as four days per week, at least ten hours per day, allowing the fifth day for travel to/from their place of residence. The Project Team member scheduled for this type of Project typically will work a weekly schedule of Monday through Thursday or Tuesday through Friday. The four-day schedule is negotiable. Consultant recognizes six national holidays that may fall during the contract (New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day). If one of these holidays falls during the weekly schedule, and it is mutually agreed upon that the Project Team member should work the holiday, 20% of the weekly fee will be billed for this time. If it is mutually agreed upon that the Project Team member should not work the holiday, 20% of the weekly fee will not be billed for that day. Time away from the Project for Consultant company meetings, vacations, or other factors will not be charged.

**Client will provide housing, meals, and transportation expenses for the Project Director, Interim Administrator, and Clinical Educator during their presence on site. Out-of-pocket expenses may also include administrative support, telephone charges, copying, postage, etc. Travel expenses include travel from place of residence to Project city, and to and from Project while on site. In most cases, this requires use of an automobile. Consultant will use whatever means necessary to keep expenses at a minimum, including use of advanced, low-priced

ticketing, and use of monthly hotel rates or hospital-owned/recommended housing (efficiency/studio) with housekeeping service. Housing must be reasonably furnished and equipped for weekday use (free internet; light cooking capability - a microwave, coffee maker, and refrigerator at a minimum), safe, and relatively convenient to the hospital. If housing is a weekly hotel room or suite, accommodations should be made for the Project Director, Interim Administrator, and Clinical Educator to store things on the weekends.

*B.2 Payment Schedule*
- Consulting fees for the Executive Sponsor, Facility Consultant, and CMEs will be billed monthly based on time spent on site the previous month.
- Consulting fees for the Project Director, Interim Administrator, and Clinical Educator will be billed one month in advance.
- Reasonable and pre-approved out-of-pocket expenses will be billed monthly as incurred.

Invoices for the consulting fees and out-of-pocket expenses will be sent via e-mail.

## EXHIBIT C

### BUSINESS ASSOCIATE AGREEMENT
### BETWEEN
### GROVE CITY SURGERY CENTER, LLC
### AND
### SULLIVAN HEALTHCARE CONSULTING, LLC

This Business Associate Agreement (this "Agreement") is entered into and effective this ___ day of October, 2016 ("Effective Date") by and between Grove City Surgery Center, LLC ("Covered Entity"), and Sullivan Healthcare Consulting, LLC ("SHC" or "Business Associate").

WHEREAS, Business Associate and Covered Entity have entered into a relationship (the "Underlying Relationship") *and to the extent* Business Associate will be, on behalf of Covered Entity, performing or assisting in performing a function or activity involving the use or disclosure of individually identifiable health information or another function regulated by 45 C.F.R. Parts 160-164, or otherwise performing services requiring the disclosure of individually identifiable health information to Business Associate (the "Services") the parties agree to comply with this Agreement;

WHEREAS, for purposes of providing the Services identified above, Covered Entity may disclose to Business Associate, and Business Associate may use, Protected Health Information ("PHI"), as that term is defined in Regulations;

WHEREAS, Covered Entity's disclosure of, and Business Associate's use of, such PHI is in furtherance of the business operations of Covered Entity, treatment of Covered Entity patients, or the payment for services provided by Covered Entity;

NOW, THEREFORE, for purposes of complying with the Regulations, the parties hereby agree as follows:

I. **Definitions.**

A. For purposes of this Agreement, Protected Health Information or PHI as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") regulations on patient privacy, confidentiality, security, transactions and unique identifiers, including 45 C.F.R. Parts 160 through 164, as revised and amended from time to time (the "Regulations"), at 45 C.F.R. §160.103, shall mean information that is received by Business Associate from, or created or received by Business Associate on behalf of, Covered Entity.

B. All other terms used, but not otherwise defined herein shall have the same meaning as those terms in the Regulations, limited to the extent such terms are applicable to the obligations of the parties with respect to PHI created or received by Business Associate on behalf of Covered Entity.

II. **Duties & Responsibilities of Business Associate**

A. Except as otherwise limited in this Agreement, Business Associate may use and/or disclose PHI to perform the Services for, or on behalf of, Covered Entity as contemplated and necessary to perform services in the Underlying Relationship, provided such use or disclosure would not violate the Regulations. Business Associate agrees not to use or further disclose PHI other than as authorized by this Agreement or as required by law, and acknowledges that any such unauthorized use or disclosure may be a violation of federal law and may trigger penalties as set forth in the Regulations and in 42 U.S.C. 17931. Business Associate shall not use or disclose PHI in a manner that would not be permissible under the Regulations if done by Covered Entity, except for the purposes specified under Section II(B) below.

B. Unless otherwise limited by this Agreement, Business Associate may:

1. Use the PHI in its possession for the proper management and administration of Business Associate or to carry out its legal responsibilities.

2. Disclose the PHI in its possession for the proper management and administration of Business Associate or to carry out its legal responsibilities, if (a) such disclosure is required by law or (b) Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person and that the person will notify Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

C. Business Associate may not:

1. Use or disclose PHI in any manner that would constitute a violation of 45 C.F.R. Parts 160 or 164.

2. Use PHI to provide data aggregation services.

3. Sell PHI, unless provided patient authorizations from Covered Entity pursuant to and in compliance with 45 C.F.R. 164.508(a)(4), expressly permitting such sale.

D. Business Associate is required to Disclose PHI:

1. When required by HHS under the provisions of HIPAA to investigate or determine Business Associate's compliance with the Regulations.

2. To the Covered Entity to allow Covered Entity to meet its requirements to satisfy an individual's request for an electronic copy of PHI, as described in 45 C.F.R. 164.524(c)(ii).

E. When using or disclosing PHI or when requesting PHI, Business Associate must make reasonable efforts to limit PHI to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request, pursuant to and subject to the exceptions provided in 45 C.F.R. 164.502(b).

F. Business Associate shall implement and use appropriate safeguards to prevent uses or disclosures of PHI other than as provided for by this Agreement, and comply, where applicable, with the applicable security standards in 45 C.F.R. Part 164, Subpart C, with respect to electronic PHI to prevent use or disclosure of the information other than as provided for in this Agreement. Upon request, Business Associate shall provide to Covered Entity a written description of such safeguards.

G. If Business Associate becomes aware of any unauthorized use, disclosure, acquisition or access of PHI, or any breach of unsecured PHI as described in Section II(P), it shall report such incident to Covered Entity in writing without unreasonable delay, and in no case later than five (5) business days after the discovery of such incident. The report should, at minimum, include (i) Subcontractor name and point of contact information, (ii) description of what happened, including the date of the incident and the date of the discovery of the incident, if known, (iii) description of the types of unsecured PHI that were involved in the incident, and (iv) description of what Subcontractor is doing to investigate the incident and to protect against any further incidents. Business Associate shall also mitigate, to the extent practicable, any harmful effect that is known to Business Associate of such incident.

H. Business Associate shall require that the subcontractors that create, receive, maintain or transmit PHI on behalf of Business Associate, agree to the same restrictions and conditions that apply to Business Associate with respect to such information and comply with the applicable security standards in 45 C.F.R. Part 164, Subpart C, by entering into a business associate agreement with all subcontractor business associates as provided in 45 C.F.R. 164.504(e)(5) and shall notify Covered Entity of any

    subcontractors who shall receive or access PHI pursuant to this Agreement upon request from Covered Entity.

I.  Within fifteen (15) business days of a written request by Covered Entity, Business Associate agrees to comply with Covered Entity's request to accommodate an individual's access to his/her PHI that is maintained by Business Associate in a Designated Record Set, to the extent necessary to assist Covered Entity to fulfill its obligations under 45 C.F.R. 164.524. In the event an individual contacts Business Associate directly about the access to PHI, Business Associate will not provide access to the individual but shall forward such request to Covered Entity within five (5) business days of such contact.

J.  Within fifteen (15) business days of a written request by Covered Entity, Business Associate agrees to comply with Covered Entity's request to make amendments to PHI that is maintained by Business Associate in a Designated Record Set, to the extent necessary to assist Covered Entity to fulfill its obligations under 45 C.F.R. 164.526. Business Associate shall promptly incorporate any such amendments into the PHI. In the event an individual contacts Business Associate directly about making amendments to PHI, Business Associate will not make any amendments to the individual's PHI but shall either promptly forward such request to Covered Entity or advise the individual to contact Covered Entity directly to make such request.

K.  Business Associate shall keep a record of disclosures of any PHI, including PHI maintained electronically, to any entity outside of Business Associate and Covered Entity and agrees to make information regarding disclosures of PHI available to Covered Entity within fifteen (15) days of a written request by Covered Entity. Business Associate shall provide, at a minimum, the following information: (i) the date of disclosure; (ii) the name of the entity or person who received the PHI, and the address of such entity or person, if known; (iii) a brief description of the PHI disclosed; (iv) a brief statement regarding the purpose and explanation of the basis of such disclosure and (v) the names of all individuals whose PHI was disclosed.

L.  Business Associate agrees it shall comply with any reasonable voluntary restriction on use or disclosure of PHI accepted by Covered Entity under 45 C.F.R. 164.522(a), which is properly communicated to Business Associate to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

M.  Business Associate shall make its internal practices, books and records relating to uses and disclosures of PHI and compliance with the HIPAA Regulations available to the Secretary of the U.S. Department of Health and Human Services or designee, for purposes of determining Covered Entity's and Business Associate's compliance with the Regulations.

N.  Upon the termination of the Underlying Relationship, Business Associate shall return or destroy all PHI, in a manner approved by HHS for the proper destruction of PHI, and will retain no copies of such information. If such return or destruction of PHI is not feasible, Business Associate agrees that the provisions of this Agreement are extended beyond termination to the PHI, and Business Associate shall limit all further uses and disclosures to those purposes that make the return or destruction of the PHI infeasible.

O.  To the extent Business Associate is to carry out Covered Entity's obligations under the HIPAA privacy standards in 45 C.F.R. Part 164, Subpart E, Business Associate shall comply with privacy standards in 45 C.F.R. Part 164, Subpart E, that apply to Covered Entity in the performance of such obligation.

P.  Business Associate shall promptly report to Covered Entity any Security Incident with respect to Electronic PHI of which it becomes aware. The term "Security Incident" shall include, but not be limited to, (i) all successful attempts to gain unauthorized access to electronic PHI ("ePHI"), (ii) unwanted disruption or denial of service to systems that contain ePHI, (iii) unauthorized use of a system for the processing or storage of ePHI data, and (iv) changes to system hardware, firmware, or software characteristics without the owner's knowledge, instruction, or consent, except that, for purposes of the Security Incident reporting requirement, the term "Security Incident" shall not include

inconsequential incidents that occur routinely, such as scans, "pings" or other unsuccessful attempts to penetrate computer networks or servers containing ePHI.

Q. Business Associate shall immediately, but in no event later than five (5) business days, notify Covered Entity of any occurrence, event or fact that could reasonably be considered an indication that a breach of unsecured PHI has occurred, including the date and time of the discovery and as much information regarding the suspected breach as is available. Business Associate shall also, thereafter, undertake an investigation of whether a breach of unsecured PHI did occur, and apprise Covered Entity of the results of the investigation on an ongoing basis. Business Associate shall cooperate fully with Covered Entity in Covered Entity's investigation and shall provide any additional information requested by Covered Entity in connection with the breach. If Covered Entity determines that a breach of unsecured PHI has occurred, which shall be determined in Covered Entity's reasonable discretion, Business Associate shall, at Business Associate's cost, take all action, which is reasonably requested by Covered Entity to mitigate the breach and to prevent further breaches of unsecured PHI. In addition to any indemnification in Section III, Business Associate shall also bear all costs incurred by Covered Entity to investigate and make required notifications of any breach of unsecured PHI by Business Associate.

R. Business Associate shall ensure that the PHI resides at all times on servers located in the continental United States of America and is not accessed by, or otherwise disclosed to, any entity or person located outside of the United States of America.

S. Business Associate agrees that Covered Entity has the right to audit, upon reasonable advance notice, Business Associate's compliance with the Regulations and the obligations and requirements of this Agreement. Business Associate shall further provide copies of any SOC I or SOC II audit reports promptly after such reports become available, but not less than annually.

### III. Indemnity

Business Associate shall indemnify, defend and hold Covered Entity and its officers, governors, trustees, and employees harmless from any alleged third-party claim or penalty against Covered Entity and/or its officers, governors, trustees or employees to the extent such claim or penalty arises from any unauthorized uses and/or disclosures of PHI related to the acts or omissions of or its subcontractors.

### IV. Termination

Notwithstanding any other provisions of this or any other agreement between Covered Entity and Business Associate, Covered Entity may immediately terminate this Agreement and the Underlying Relationship if Business Associate has materially violated its responsibilities regarding PHI under this Agreement and has failed to provide satisfactory assurances to Covered Entity within ten (10) days of occurrence of such material violation that the violation has been cured and steps taken to prevent its recurrence.

### V. Governing Law

This Agreement is made pursuant to and shall be construed and enforced in accordance with the laws of the State of Ohio, without regard to its choice of law principles. Any action arising out of or related to this Agreement shall be brought exclusively in the state or Federal courts located in Franklin County, Ohio, and each party consents to the exclusive jurisdiction and venue of such courts.

### VI. Amendment

This Agreement may be amended only in a written document signed by both parties. Notwithstanding anything contained herein to the contrary, to the extent that any provision of this Agreement is in conflict with any law, regulations, rule or administrative policy of any governmental entity, this Agreement will have been deemed to have been amended in order to bring it into conformity with these provisions.

### VII. Assignment

This Agreement may not be assigned by either party without the prior written consent of the other party. Except for the prohibition on assignment contained in the preceding sentence, this Agreement shall be binding upon and inure to the benefits of the successors and assigns of the parties hereto.

### VIII. Waiver of Breach

The waiver by either party of a breach or a violation of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof. No waiver shall be effective against any party hereto unless in a writing signed by the party.

### IX. Survival

The responsibilities of Business Associate under this Agreement shall survive termination of this Agreement indefinitely.

### X. No Third-Party Beneficiaries

Nothing express or implied in this Agreement is intended or implied to confer, and nothing herein shall confer, any rights, remedies, liabilities, or obligations whatsoever upon any person or entity other than the parties hereto.

### XI. Severability

If any provision of this Agreement is held invalid, the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefits of the remaining provisions of this Agreement.

### XII. Notices

Notices or communications required or permitted by this Agreement or by law to be served on or given to any party hereto by another party to this Agreement shall be in writing and shall be deemed duly served when personally delivered or mailed by certified or registered mail (postage prepaid) or sent by any nationally recognized overnight courier service (charges prepaid), addressed as follows:

**If to Covered Entity:** Grove City Surgery Center, LLC
C/O Deb Kuntz MBA, BSN, RN
Senior Director Joint Ventures
OhioHealth Neighborhood Care
180 E. Broad Street
Columbus, Ohio 43215

**If to Business Associate:** Sullivan Healthcare Consulting, LLC
Attn.: Randall Heiser, President
2655 Northwinds Parkway
Alpharetta, Georgia 30009

**SIGNATURES ON NEXT PAGE**

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed in its name and on its behalf as of the Effective Date.

| "COVERED ENTITY" | "BUSINESS ASSOCIATE" |
|---|---|
| GROVE CITY SURGERY CENTER, LLC | SULLIVAN HEALTHCARE CONSULTING, LLC |
| *[signature]* | |
| Signature | Signature |
| JOSEPH CALVARUSI | |
| Printed Name | Printed Name of Authorized Representative |
| ACCOUNTABE EXEC | |
| Title | Title |
| 10/25/16 | |
| Date | Date |

COLUMBUS/1823410v.3